[No. 3775.]

## JOHN HART *v*. THE STATE.

1. MURDER—IMPLIED MALICE is that which the law infers from or imputes to certain acts. Thus, when the fact of an unlawful killing is established, and there are in evidence no circumstances which tend to establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act, then the law implies malice, and the offense is murder in the second degree.
2. SAME—CHARGE OF THE COURT.—In determining the sufficiency of a charge of the court it must be considered as a whole, and not by isolated parts or paragraphs. If as a whole it is correct and sufficient, it meets the demands of the law.
3. SAME.—The rule obtains in this State that it devolves upon the defense to reserve exception to an objectionable charge, or to request of the trial court a special instruction correcting the objectionable features of the charge, and that, if one or the other step is not taken, the charge will not be revised on appeal, unless the misdirection or omission complained of is of such character, in view of all the circumstances of the case, as may have injured the rights of the defendant. Applying this rule to the objection urged to the seventh paragraph of the charge in this case, the objection can not be held fatal in the absence of an exception and of a requested instruction, and further, the omission is *held* to have been cured and supplied by the ninth paragraph. See the statement of the case for the seventh and the ninth paragraphs of the charge.
4. PRACTICE—NEW TRIAL.—Article 779 of the Code of Criminal Procedure provides that "a new trial must be applied for within two days after conviction; but for good cause shown, the court, in cases of felony, may allow the application to be made at any time before the adjournment of the term at which the conviction was had." The record discloses that the trial court, in this case, entertained the motion for new trial and considered it upon its merits, although it was not filed within the time prescribed by law. *Held*, that such action was within the sound discretion of the trial court, and the presumption obtains that the necessary good cause was shown.
5. NEW TRIAL—NEWLY DISCOVERED EVIDENCE.—See the statement of the case for newly discovered evidence set forth in support of an application for new trial, upon which it is *held* that the new trial should have been awarded.

APPEAL from the District Court of Lamar. Tried below before the Hon. D. H. Scott.

The conviction in this case was for an assault with intent to murder one A. S. Huff, in Lamar county, Texas, on the

eighteenth day of June, 1885. A term of five years in the peni-
tentiary was the punishment assessed against the appellant.

A. S. Huff was the first witness for the State. He testified
that he knew the defendant, and pointed him out in open court.
On the night of June 18, 1885, witness and a man named Charley
Conners attended a concert at the opera house in the city of
Paris, Lamar county, Texas. Witness, who was a carpenter by
trade, had secured employment from Conners, and was to go
with him to the Indian Nation on the next day to work on a
building. After the conclusion of the concert, Conners sug-
gested a search for some workmen. Witness replied that it was
then too late to find workmen, and he and Conners agreed to go
to "Boardtown," to see some women. They first went to some
houses of ill fame conducted by white women, but failing to
secure accommodation, went to the house of ill fame conducted
by Jane Hart, a negress. While Conners and the witness were
standing on the porch of Jane's house, knocking at the door, the
defendant and his wife came along, and defendant asked:
"What in the h—ll are you doing there?" Witness replied, in
substance, that it was none of his "d—d business." Defendant
replied: "I will show you whether or not it is any of my busi-
ness," and stepping up to witness, stabbed him and ran off.
Witness was making no demonstrations toward the defendant
when the latter inflicted the stab, the locality of which the wit-
ness showed the jury by pointing out the cut in his vest through
which the knife entered his body. Witness and Conners then
went to the Beard restaurant. The wound inflicted by the de-
fendant on that occasion had never got well, and witness did
not think it would ever get entirely well. He still suffers from
it, and had been confined to his bed from its effects almost ever
since it was inflicted. Defendant was drunk when he stabbed
the witness.

Cross-examined, the witness testified that he and Conners went
to the saloon kept by Frees and got a drink of beer. He had a
glass of beer before he went to the concert, but was not drunk.
From Frees's saloon he and Connors went to witness's room,
whence they went to Boardtown. The witness had never told
any person that he was drunk on the night he was stabbed.
Witness and Conners were standing on the porch in front of
Jane Hart's house when the defendant and his wife came up,
and defendant asked what they were doing there. Witness had
no recollection of cursing the defendant, yet he may have called

him a "d—d son-of-a-b—h." When cut, the witness was some eight or ten steps from the house. Witness did not know that he was cut until he reached his room, which was quite four hundred yards distant from the place of cutting. At the time of the cutting Conners was standing somewhat to the witness's right, and between witness and defendant. Defendant cut witness just as witness turned around. Witness was doing nothing when cut, but Conners and the defendant were quarreling at that time. Conners had a bottle of whisky in his pocket at the time of the cutting.

Doctor E. W. Rush testified, for the State, that he was called, in his professional capacity, to see A. S. Huff on the night of June 18, 1885. Huff was suffering from a very severe knife wound in the left breast. The knife had penetrated the left lung. The witness could not describe the character of the knife with which the wound was inflicted. Huff had never recovered from the effects of that wound.

William Gullick testified, for the State, that he was a member of the police force of the city of Paris. On the night of June 18, 1885, he heard that some one had been stabbed at Jane Hart's house. He went to Beard's restaurant and found Huff sitting on the steps. Huff told witness that John Hart had stabbed him. Witness summoned Conners, the man who was with Huff, and repaired to Boardtown, which they searched unsuccessfully for the defendant. Jane Hart's house had the reputation of being a house of prostitution.

City marshal L. B. Hunt testified, for the State, that Jane Hart's house had the reputation of being a house of prostitution. Conners had a bottle containing a small quantity of whiskey, shortly after the stabbing of Huff. He offered witness a drink from his bottle.

Sheriff W. T. Gunn testified, for the State, that he received the defendant from the hands of the city marshal of Honey Grove, on the morning after Huff was stabbed. Honey Grove was twenty-two miles distant from Paris. The State closed.

Jane Hart was the first witness introduced by the defense. She testified that the defendant was her son. Witness and her daughter Fannie went to Clarksville on the eighteenth day of June, 1885. Before going, the witness requested her son, the defendant, and his wife, to sleep at her house on that night. She did so because two or more efforts had been made to burn her house, and she wanted defendant and his wife there to pro-

tect her house in her absence. No one but witness and her daughter were occupying the house on June 18, 1885. A woman who had previously lived with them had recently left. No person was at the witness's house on the night that defendant stabbed Huff.

Mary Hart, the wife of defendant, testified in his behalf, that she witnessed the difficulty between the defendant and Huff in which the latter was stabbed. Witness spent the first part of that night at the house of George Hart, her brother-in-law. The defendant, who was employed at an ice cream parlor, came by George Hart's for her, after his business closed, and told her that they were to spend that night at the house of his mother, Jane Hart. When the witness and defendant reached the corner of Jane Hart's yard, they saw two men standing on the gallery of the house, one of whom was knocking on the door. Defendant asked them what they were doing at that house. Huff asked, in reply: "What in the h–ll is it of your business?" Defendant replied: "The women have gone to Clarksville, and my mother asked me to stay and take care of the house." Huff said: "I believe you are a God d——d liar, you d——d yellow son-of-a-b——h!" Mr. Conners then asked: "You say the women are not here, and that they have gone to Clarksville?" Defendant replied: "Yes." Huff then said: "You are a d——d lying son-of-a-b——h!" Conners then said: "Huff, let's leave here, and not have a fuss at a negro whore house. What in the h–ll do you want to fuss with a d——d negro for?" Huff replied: "No; I came here to bang something, and I am going to do it before I leave here." He then asked defendant: "Who is that you have with you?" Defendant replied: "It is my wife." Huff said: "You are a God d——d liar!" Defendant repeated that he had his wife with him. Huff then said: "I had as soon bang your wife as any other woman," and caught witness. Defendant told Huff to release witness, and witness pulled loose from Huff. Defendant said to Huff: "You must not do that again; she is my wife, and I won't stand it." Huff caught witness again, when defendant said: "I wont stand that. If I had grabbed your wife, you would have shot me full of holes long ago." Huff then drew a pistol, threw it in defendant's face and said: "I will kill the d——d yellow son-of-a-b——h, and then bang her." About this time the defendant struck Huff, and ran around the house, and witness ran into the street. She saw no more of the defendant until she saw him in jail. Witness was about

seventeen years old, and had lived nearly the whole of her life in Paris. Witness did not visit Jane Hart's house, nor did she know that it was reputed to be a house of prostitution.

Put. Johnson, colored, testifying for the defense, detailed the transaction at Jane Hart's house, from the time that defendant discovered Connerr and Huff at the door, until the defendant ran off, in almost the identical language employed by defendant's wife in her testimony. He located himself in close proximity to the house when the difficulty occurred, testifying that he met defendant and his wife at the corner of Jane Hart's yard, and gave him a match, just at or about the time defendant discovered the two men at his mother's door.

On his cross-examination, the witness Johnson testified that he lived just beyond Jane Hart's house from the square. He had, on that day, been at work at Bray's farm, some seven miles from town, and was on his way home when he met the defendant and his wife, and witnessed the difficulty. About the time that he was struck, Huff handed his pistol to Conners, staggered a little, and the two went off together towards town. A man looking from Jane Hart's yard could have seen another standing at the point where witness stood when the difficulty occurred. The moon was shining.

City marshal Hunt, recalled for the defense, testified that he found a nickel plated pistol on the person of Conners shortly after the stabbing of Huff.

A. S. Gantt, one of the firm in whose employ the defendant was at the time of the difficulty, testified, for the defense, that defendant was sober when he, witness, left his ice cream establishment on that night at fifteen minutes before eleven o'clock. Mr. Roach, the other member of the firm, testified that defendant was perfectly sober when he left the ice cream parlor at half past eleven o'clock on that night. The defense closed.

A. S. Huff, recalled by the State, testified in rebuttal that he was not drunk when stabbed; that he had no pistol; that defendant did not tell him the woman with him was his wife; that he, witness, did not take hold of the woman, and that he saw no one in the street, but could easily have seen a person standing where the witness Johnson says he stood.

The seventh and the ninth paragraphs of the charge of the court constitute the subject matter of the third head note of this report. The seventh paragraph reads as follows:

" 7. Implied malice is malice presumed by law from the com-

mission of any deliberate and cruel act, however sudden, done or committed without just cause or excuse."

The ninth paragraph reads as follows:

"9. If the defendant committed the assault upon A. S. Huff, without justification or excuse, but under such circumstances, that, if death had ensued from the act, the offense would have been manslaughter as hereinafter defined, then I instruct you that the defendant would be guilty of an aggravated assault and battery. This makes it necessary for me to instruct you as to the law of manslaughter."

The appellant's supplemental motion for a new trial, referred to in the last head note of this report, sets out the newly discovered evidence of the witness Goble as follows: "On or about the twentieth day of July, 1885, H. S. Huff, the party on whom he is alleged to have made the assault, told one John Goble that he, Huff, was to blame for the difficulty, and that this defendant ought to have killed him. He, Huff, stated to said Goble, in said conversation, that the cause for this defendant stabbing him was that he took hold of defendant's wife, and told her in insulting and vulgar language, that he, Huff, came there to have sexual intercourse with the other women, and if he could not find them he would have it with her. He stated that this defendant was present and heard it, and immediately rushed upon him."

The affidavit of John Goble, setting forth the above facts, was attached to the motion.

The affidavits of L. B. Hunt, J. H. McRady, and J. F. Barkley, are also attached to the motion for new trial, and are referred to in the supplemental motion for new trial. The affidavit of Hunt alleges that the State's witness Conners told him, on the night of and after the assault, that before Huff was stabbed by the defendant, he, Huff, took hold of the person of defendant's wife, and defendant, before stabbing Huff, told him that the woman was his wife, and begged Huff to release her.

McRady's affidavit alleges that one Richard Dowes told him that he, Dowes, witnessed the cutting of Huff, and all of its attendant incidents; he saw Huff seize defendant's wife, and heard defendant beg Huff to release her; he saw Huff draw a pistol on defendant and thrust it in his face, whereupon defendant stabbed Huff.

Barkley's affidavit recited the fact that Huff, on two or three different occasions, told him that he was drunk when Hart

stabbed him, and that he knew nothing whatever of the particu-
lars of the stabbing.

The objection urged to the seventh paragraph of the charge
will be found stated as the first ground in the argument for the
appellant, which follows:

*Dudley & Gaines*, for the appellant: Upon the first proposi-
tion in the assignment of errors, that the court erred in its defi-
nition of implied malice in the seventh paragraph of its instruc-
tions, we maintain that said definition is clearly defective and
erroneous; because it omits to state to the jury that, in order
for malice to be implied, the killing must not be committed un-
der the immediate influence of sudden passion arising from an
adequate cause, to reduce it to manslaughter. (Penal Code, Art.
605; Smith v. The State, 19 Texas Ct. App., 95, and cases cited.)

This court has held that a failure to define malice correctly in
a case of assault with intent to murder, is fundamental error,
whether excepted to on the trial or not, and that it makes a re-
versal of the case necessary, although no statement of facts has
been made out and sent up with the transcript. (Anderson v.
The State, 1 Texas Ct. App., 517; Williams v. The State, 3 Texas
Ct. App., 470; Ewing v. The State, 4 Texas Ct. App., 429; Dan-
iels v. The State, Id., 429.)

Under the facts of the present case, we contend that the
charge complained of is especially objectionable because of its
being misleading and grossly prejudicial to the rights of the de-
fendant. From this definition the jury might reasonably have
concluded that, if the stabbing was neither excusable nor justi-
fiable, it was necessarily malicious, and hence would be murder
if death had resulted, and therefore was assault with intent to
murder in the case before them. The main issue was, would it
have been murder or not if death had ensued; and we think
there can be no question but that if it be necessary to define
malice in every case, as decided by this court, it is imperative
in a case like this one to define it in a manner so as not to mis-
lead the jury upon a vital point in the case. (Neyland v. The
State, 13 Texas Ct. App., 536, which was reversed for a similar
error in the definition of implied malice; see also Turner v. The
State, 16 Texas Ct. App., 391.)

We further submit that the court erred in overruling defend-
ant's amended motion for a new trial, filed October 27, 1885, and
on this proposition we especially ask the attention of the court

to the newly discovered evidence of Richard Dawes. We think this comes within the most rigid rules of such motion on the ground of newly discovered evidence. The statement of facts shows that the difficulty occurred at night and it no where appears from the evidence or the affidavits that defendant or his attorneys knew of Dawes's presence, or had any reason to suppose that he knew anything whatever about the transaction until after trial and verdict. The affidavits negative this. The affidavit of Dawes could not be procured, but that of J. H. McRady, to whom he stated what he knew about the case, is attached to the motion. This is sufficient. (See Cole v. The State, 40 Texas, 148–9.)

It can not be objected that this evidence is merely cumulative. Suppose the testimony of the prosecuting witness, unsupported, prevails over that of two witnesses for defendant, whom, perhaps, the jury discredited, although the latter, if credited, would have made out a complete defense, must it also prevail over that of a newly discovered witness merely because he states substantially the same facts? This would place the defendant in a worse position than if he had adduced no testimony at all, although the newly discovered witness corroborates directly the witnesses introduced by him at the trial. This court has held otherwise. (Bullock v. The State, 12 Texas Ct. App., 49. See, also, Railway Company v. Forsyth, 49 Texas, 171.)

We further maintain that the court erred in overruling the supplemental motion for a new trial, filed after sentence. This motion is in all respects similar to that in the case of Bullock v. The State, 12 Texas Court of Appeals, 49, above cited, and is equally as strong. In that case, this court held the new trial should have been granted, and for that reason reversed the judgment. (See, also, Railway Company v. Forsyth, 49 Texas, 171.)

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. It is insisted in the first error assigned that the court's charge to the jury in the definition given of implied malice was incorrect, erroneous, and calculated to mislead the jury. Approved charges upon malice, and upon malice express and implied, will be found in Willson's Criminal Forms, pages 332 and 333: "Implied malice is that which the law infers from, or imputes to, certain acts. Thus, when the fact of

an unlawful killing is established, and there are no circum-
stances in evidence which tend to establish the existence of ex-
press malice, nor which tend to mitigate, excuse, or justify the
act, then the law implies malice, and the offense is murder in the
second degree." (Smith v. The State, 19 Texas Ct. App., 95, and
authorities cited.)

Whilst the seventh paragraph of the charge may not be as full
as it might be, and perhaps should have been, upon implied
malice, yet, in the absence of a bill of exceptions taken to it, and
when the charge is considered as a whole, we can not say that
the omission complained of has not been cured in subsequent
portions thereof, and even if not, whether the omission would be
reversible error in the absence of an exception, or, at least, a
special instruction covering the supposed defect. That a charge
should be considered as a whole, and not by isolated parts or
paragraphs, in determining its sufficiency, is the well established
rule of practice in this State, and if as a whole, it is sufficient,
the demands of the law are met. (Clark's Crim. Law, p. 515, note
204; Elam v. The State, 16 Texas Ct. App., 34; Lewis v. The
State, 18 Texas Ct. App., 401.) We are of opinion that the com-
plaint as to the seventh paragraph is cured by the ninth para-
graph of the charge, and that, when the two are taken and con-
sidered together, the jury could not have been misled by the
former.

Defendant's motion for a new trial was not filed within two
days after the conviction, as required by law (Code Crim. Proc.,
Art. 779), and it is therefore insisted by the Assistant Attorney
General that the action of the court in overruling it should not be
revised by this court.

"A new trial must be applied for within two days after con-
viction; but for good cause shown, the court, in cases of felony,
may allow the application to be made at any time before the
adjournment of the term at which the conviction was had."
(Code Crim. Proc., Art. 779; Bullock v. The State, 12 Texas Ct.
App., 42.) It appears from the record that the court entertained
the motion for a new trial, although not filed within the pre-
scribed time, and considered the same upon its merits. This
action was within the discretion of the court, and must be pre-
sumed to have been upon good cause shown. (Hernandez v. The
State, 18 Texas Ct. App., 147.) In the case under consideration,
no objection was made to the motion upon the ground stated, in
the court below, and the court having heard the motion, evidence

and argument thereon, under the rule as above stated, this court will presume that good cause was shown the court why the motion should be considered, though not filed within time. Considering the motion, then, as one properly acted upon by the court, and that the action of the court upon it is subject to revision, the question is, should the motion have been granted?

In part, the motion is based upon newly discovered testimony. This testimony is certainly most important. It cannot be said that it is not probably true, because it is neither unreasonable nor improbable, and is in harmony with the testimony adduced at the trial; and, we think, ample reason is shown why it could not and was not discovered by defendant before or upon the trial. The testimony upon which this conviction rests, as it is manifested by this record, does not impress us with the conviction that the newly discovered testimony should not and will not likely change the result upon another trial.

We are of opinion that the court should have granted a new trial, and we therefore reverse the judgment and remand the cause for a new trial.

*Reversed and remanded.*